SLIP OPINION

Cite as 2015 Ark. 219

# SUPREME COURT OF ARKANSAS

No. CR-08-1386

| | |
|---|---|
| KENNETH ROSHELL ISOM<br>APPELLANT | **Opinion Delivered** May 21, 2015 |
| V. | PETITION TO RECALL THE MANDATE |
| STATE OF ARKANSAS<br>APPELLEE | |
| | <u>PETITION DENIED</u>. |

**KAREN R. BAKER, Associate Justice**

Before this court is Petitioner Kenneth R. Isom's petition to recall the mandate in his postconviction case of *Isom v. State*, 2010 Ark. 495, 370 S.W.3d 491 (*Isom II*). In a death penalty case, this court has the inherent authority to recall its mandate for extraordinary circumstances. *Nooner v. State*, 2014 Ark. 296, at 9, 438 S.W.3d 233, 239, *cert. denied*, No. 14-7664, 2015 WL 1400885 (U.S. Mar. 30, 2015).

## I. *Facts and Procedure*

This court extensively reviewed the facts surrounding Isom's conviction and sentence in *Isom v. State*, 365 Ark. 156, 148 S.W.3d 257 (2004) (*Isom I*). In short, Isom was convicted in 2001 by the Drew County Circuit Court jury of capital murder, residential burglary, attempted capital murder, rape, and aggravated robbery in connection with the murder of William Burton and the rape of Burton's sister-in-law, Dorothy Lawson. *Id.* During his trial, Isom was represented by G.B. "Bing" Colvin, a Drew County Public Defender. Colvin was assisted by two other public defenders, Tim Bunch and Gary Potts. Isom was sentenced to

SLIP OPINION

death for capital murder and received additional sentences of life in prison for aggravated robbery and for rape, sixty years for attempted capital murder, and forty years for residential burglary, with the sentences to run consecutively. *Id.* This court affirmed his convictions and sentences in 2004. *Id.*

After his convictions and sentences were affirmed, Craig Lambert was appointed on November 1, 2004, to represent Isom during postconviction proceedings. On January 31, 2005, Lambert filed a petition for postconviction relief under Arkansas Rule of Criminal Procedure 37.5. Lambert included eleven possible bases for relief: (1) Trial counsel failed to investigate and file appropriate motions to show that Isom was ineligible for the death penalty due to mental retardation; (2) Trial counsel failed to investigate and present exculpatory evidence, including the purported confession of another individual, Jerry Don Avery, and two alibi witnesses, Treva Lamb and Yvonne Bealer; (3) Trial counsel failed to properly investigate Isom's social history and failed to explore and present mitigation evidence during the penalty phase; (4) Trial counsel failed to seek out independent DNA testing of a hair found during the rape-kit examination of Ms. Lawson; (5) Trial counsel failed to ensure that the jury was instructed on statutory mitigating factors; (6) Trial counsel failed to challenge the introduction of evidence of Isom's prior nonviolent felony offenses during the penalty phase; (7) Trial counsel failed to object to the prosecuting attorney's questioning prospective jury members regarding whether they could "commit to" signing a death-penalty verdict form and, therefore, the issue was not preserved for review during Isom's direct appeal; (8) Trial counsel failed to object to the trial court's refusal to strike two jurors, Billie Handley and Sanders

Bealer, for cause; (9) Trial counsel failed to object to Ms. Lawson's in-court identification of Isom and, consequently, failed to preserve his earlier motion to suppress Ms. Lawson's prior photo-lineup identification; (10) Trial counsel improperly opened the door to the prosecutor's statements during closing argument that if Isom were not sentenced to death he could potentially escape and commit other murders; (11) Trial counsel failed to object to a "blatant" violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985), that occurred when the prosecutor remarked that the victim in this case received "no appeal."

Subsequent to the filing of Isom's Rule 37.5 petition, Lambert filed a motion for continuance, motion for appointment of co-counsel, a motion for funds for expert assistance, a motion for leave to file an amended petition for postconviction relief, and an amended motion requesting appointment of co-counsel, in addition to responding to motions to dismiss filed by the State. By order filed on May 23, 2005, the trial court granted the motion for continuance, appointed Bruce Eddy as co-counsel, granted the motion to file an amended petition and "released" Isom from the "page requirements of Rule 37," and denied the motion for funds for an expert witness as moot based on the appointment of a public defender as co-counsel.[1]

On July 19, 2005, Lambert filed a second petition for postconviction relief under Rule 37.5. The second petition included the same eleven claims but was verified. On August 1,

---

[1]On July 11, 2005, the trial court entered an order setting aside the appointment of Bruce Eddy as co-counsel. In that order, the trial court stated that Lambert had "represented to the Court that he had discussed with Mr. Bruce V. Eddy . . . the matter of being appointed . . . and that Mr. Eddy had agreed to such appointment," but that Lambert "had in fact been told . . . that the Federal Public Defender's Office could not accept the appointment."

2005, Lambert filed a motion to withdraw. In his motion, Lambert stated that his mother was terminally ill and he could not "provide competent representation to Isom at the present time." Lambert requested that the court appoint Jeff Rosenzweig as counsel. The trial court granted Lambert's motion to withdraw and substitute Rosenzweig as counsel on October 6, 2005. Thereafter, on June 7, 2006, Rosenzweig filed a motion for authorization of funds to retain an investigator, mitigation specialist, and psychologist, and for funds to obtain DNA testing on the hair recovered from the rape victim. By order filed on July 13, 2006, the trial court granted the motion.[2]

On January 14, 2008, Rosenzweig filed "Proposed Findings of Fact and Conclusions of Law" detailing the facts and law supporting each of Isom's eleven claims for relief. The record reveals that Rosenzweig did not amend the previously filed Rule 37.5 petition on Isom's behalf. The State filed a brief opposing Isom's Rule 37.5 petition on March 28, 2008. Then, on September 22, 2008, the trial court entered its order dismissing Isom's petition. On the same date, Rosenzweig filed a notice of appeal. As stated, this court affirmed the trial court's dismissal of Isom's Rule 37.5 petition on December 16, 2010. *Isom II*, 2010 Ark. 495, 370 S.W.3d 491. On that same date, this court affirmed the trial court's denial of Isom's "DNA Habeas" petition requesting additional DNA testing on the hair recovered from the

---

[2]The trial court allocated $7500 for the identified expenses. Rosenzweig subsequently filed a motion to lift the "artificial cap" on defense expenses. In that motion, Rosenzweig stated, "Craig Lambert originally was appointed on this matter. He was later relieved and undersigned counsel appointed. . . . The preparation of this matter is proceeding apace, and it is likely that counsel will seek to amend the Rule 37 petition with matters which have been discovered in the investigation."

SLIP OPINION

rape victim. *Isom v. State*, 2010 Ark. 496, 372 S.W.3d 809 (*Isom III*).

On May 1, 2013, Isom filed the instant motion seeking recall of this court's mandate in his Rule 37 case.[3] Isom maintains that this court should recall its mandate in his Rule 37.5 case because he was denied effective, conflict-free representation. Specifically, Isom maintains that his original postconviction counsel, Lambert, was impaired by substance abuse and personal crisis; that his postconviction counsel, Rosenzweig, had a conflict of interest because he hired Tyler Green as an investigator, despite the fact that Green worked in the same office as one of Isom's trial attorneys; that neither Lambert nor Rosenzweig sufficiently investigated and presented issues surrounding Isom's social history during the Rule 37.5 proceedings; that Rosenzweig failed to amend the Rule 37.5 petition to include claims that critical portions of Isom's trial were performed by unprepared counsel; that trial counsel suffered a disqualifying conflict of interest because he represented another inmate, Kevin Green, who secured a partial release on his own recognizance by providing information regarding the location of the murder weapon in Isom's case; that Rosenzweig waived the claim that Isom's trial counsel was ineffective for failing to develop and raise a claim that Isom was not eligible for the death penalty due to intellectual disability; and that during the Rule 37.5 proceedings, Rosenzweig failed to present evidence that the photo lineup used in the police investigation was "woefully deficient" and "biased in its composition." Finally, Isom maintains that this court should recall the mandate in his postconviction proceeding because Isom is categorically ineligible

---

[3]The instant motion was filed under his postconviction appeal case number, CR–08–1386. Therefore, the motion before the court is to recall this court's mandate in Isom's postconviction appeal and his direct-appeal mandate is not implicated.

SLIP OPINION

for the death penalty due to a stroke he suffered while in custody. We deny Isom's petition to recall the mandate in his postconviction proceedings because he has not identified any error on the part of this court that would constitute a breakdown in the appellate process. We do not reach his claim that he is categorically ineligible for the death penalty because that claim is not yet ripe as there is no date set for Isom's execution.

## II. *Standard of Review*

In *Lee v. State*, 367 Ark. 84, 238 S.W.3d 52 (2006), appellant Ledell Lee moved this court to recall our mandate and reopen his postconviction proceedings on the basis that his Rule 37 counsel was impaired by alcohol use during those proceedings, a fact admitted to by counsel. *Id.* at 87, 238 S.W.3d at 54. In that case, this court applied the same standard for recalling the mandate in a postconviction case as it does in a direct-appeal case. This court elaborated,

> In *Robbins*, we recognized that "this court will recall a mandate and reopen a case in extraordinary circumstances." *Id.* at 564, 114 S.W.3d at 222. However, in deciding to recall the mandate, we specifically explained that our decision was based on three factors: 1) the presence of a defect in the appellate process; 2) a dismissal of proceedings in federal court because of unexhausted state court claims; and 3) the appeal was a death case that required heightened scrutiny. Thus, these three criteria must be satisfied in order for this court to consider the relief requested by Lee.

*Id.* at 88, 238 S.W.3d at 54–55. More recently, this court determined that while the three *Robbins* factors are relevant factors for this court to consider when presented with a motion to recall a direct-appeal mandate in a death-penalty case, strict satisfaction of all three factors is not required because this court has the inherent authority to recall its mandate in extraordinary circumstances. *Nooner*, 2014 Ark. 296, at 9, 438 S.W.3d at 239. While the

standard for recalling the mandate in a postconviction case is the same as the in a direct–appeal case, we emphasize that the recall of the mandate is an extremely narrow remedy, and we will not enlarge it to allow typical claims of ineffective assistance of counsel. *Ward v. State*, 2015 Ark. 62, at 9–10, *reh'g denied* (Apr. 9, 2015).

## IV. *Points on Appeal*

### A. Allegation that Lambert was Impaired by Substance Abuse and Personal Crisis

Isom's first argument for recalling the mandate in his postconviction appeal is that Lambert was impaired during his representation of Isom and, as a result, failed to conduct an investigation or plead "many available meritorious claims" for relief. In support, Isom points this court to the fact that Lambert was impaired during his representation of Ledell Lee. In addition, Isom contends that although Lambert indicated he was constrained by the ten–page limit imposed by Rule 37, and the court permitted him to exceed that limit, Lambert never amended Isom's petition to raise additional claims. In support, Isom points to an affidavit executed by Rosenzweig stating that Lambert was in a "distressed condition" during his representation of Isom and required psychological treatment for substance abuse.

In *Lee*, this court held that, as a result of his substance–abuse problems, Lambert was not functioning at the level of qualified or competent counsel required by Rule 37.5 during his representation of Ledell Lee. *Lee*, 367 Ark. at 91, 238 S.W.3d at 56–57. In doing so, this court recounted the following examples of Lambert's "troubling behavior":

> • belligerent attitude towards the prosecuting attorney;
> • being unable to locate the witness room;
> •repeatedly being unable to understand questions posed by the trial court or objections raised by the prosecution;

•not being familiar with his own witnesses;
•not properly serving witnesses or telling them not to attend the hearings, only to call them during the hearing;
•routinely forgetting basic rules of procedure regarding the admission of evidence;
•failing to prepare for the hearing by organizing evidentiary items or meeting with witnesses;
•rambling incoherently, repeatedly interjecting "blah, blah, blah" into his statements.

*Id.* at 91, 238 S.W.3d at 57. In fact, Lambert's behavior became so erratic that during Lee's Rule 37 hearing, counsel for the State requested that Lambert submit to a drug test.[4] *Id.*

In the present case, Rosenzweig, who took over Isom's representation after Lambert withdrew, stated in an affidavit:

> Roughly around the time I took over that case from Mr. Lambert, another lawyer and I took [Lambert] to Bridgeway, a psychiatric clinic in North Little Rock that offers substance abuse treatment. Another lawyer and I had been called to his office and when I arrived I found him in a distressed condition. At the time he was living in his office, with his mattress in the attic rafters.
> . . . .
> Mr. Lambert wrote the Rule 37 petition in Isom's case. Although I was not privy to everything he had done, it appeared to me that he did not do much in the case other than talk with Isom and maybe a run-through on some family members.

Rosenzweig's affidavit does not point to any specific failures on the part of Lambert during Isom's Rule 37.5 proceedings. As stated, Lambert filed a lengthy petition on Isom's behalf, raising several potential claims for postconviction relief. The petition included factual and legal assertions in support of each claim. Isom does not point to any behavior by Lambert that was erratic. In fact, Lambert withdrew from his representation of Isom, citing his mother's

---

[4]This request appeared in Lee's postconviction record and occurred during a hearing held on March 30, 1999. *Lee v. Norris*, 354 F.3d 846, 848 (8th Cir. 2004). Lambert was appointed to represent Isom over four years later on November 1, 2004, and filed Isom's first Rule 37.5 petition on January 31, 2005.

SLIP OPINION

illness, prior to the hearing on Isom's Rule 37.5 petition. The fact that Lambert may have been sleeping in his office and may have required treatment of some form at "roughly the same time," absent some external impact on Isom's case, is not sufficient to show that his representation fell below the level of qualified or competent counsel required by Rule 37.5.

Moreover, this court recalls its mandate in order to cure a defect or breakdown in the appellate process. Lambert withdrew from his representation of Isom prior to the trial court's order denying Isom's Rule 37.5 petition. He did not represent Isom on appeal and did not represent Isom at the Rule 37.5 hearing. Rosenzweig's affidavit asserting that Lambert was in a "distressed condition" was executed in 2013, three years after Isom's 2010 postconviction appeal to this court. Therefore, unlike the situation in *Lee* where Lambert's erratic behavior, and the State's request for drug testing, appeared in the record that was before this court during the postconviction appeal, Isom fails to point to any erratic or incompetent behavior by Lambert that was shown by the record before this court in 2010. There must be an error in the record that was before this court during Isom's Rule 37.5 appeal in order to say that this court made an error that resulted in a breakdown of the appellate process. *See, e.g.*, *Nooner*, 2014 Ark. 296, 438 S.W.3d 233 (defining a "breakdown of the appellate process" as an error alleged to have been made by this court during the course of its appellate review).

### B. Conflict of Interest

Isom's next claim for recalling the mandate is that the "legal team" that replaced Lambert had a "disabling conflict of interest," because the investigator, Tyler Green, worked in the same office as one of Isom's trial attorneys, Tim Bunch, and was employed by the same

agency that employed Isom's other trial attorneys, Colvin and Potts. As his primary support, Isom cites this court's opinion in *Hill v. State*, 263 Ark. 478, 566 S.W.2d 127 (1978) (per curiam), in which we held that appointment of one public defender to represent an indigent criminal defendant who alleges ineffective assistance of counsel by another public defender creates a conflict of interest. In addition, Isom contends that Rule 37.5 prohibits the appointment of an attorney who represented the defendant during his capital–murder trial in order to prevent conflicts of interest. According to Isom, this court "should have been aware" that Green and Bunch served in the same office of the Public Defender Commission in Pine Bluff. Isom contends that this court's failure to note and correct this conflict on its review is a breakdown in the appellate process that warrants recall of the mandate.

*Hill* dealt only with the attorney appointed to represent a defendant during postconviction proceedings. Because Isom does not point to any actual conflict that arose during Green's investigation or to any specific failing in Green's investigation that would have changed the result of Isom's postconviction proceedings, we decline Isom's invitation to extend *Hill* to include all employees of the public defender's office. *See, e.g., Townsend v. State*, 350 Ark. 129, 85 S.W.3d 526 (2002) (holding that to show ineffective assistance of counsel based on a conflict of interest the defendant must show an actual conflict that adversely affected the adequacy of his representation or, in the absence of an actual conflict, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different).

SLIP OPINION

## C. Failure to Investigate

For his next point, Isom contends that Rosenzweig failed to perform a social-history investigation required by prevailing professional norms and this court's precedent. Instead of pointing to any error by this court, Isom contends that "[c]ounsel's failure to gather and present readily available evidence deprived Mr. Isom of his 'day in court' and was a 'breakdown in the criminal-justice process.'" To reiterate, recalling the mandate is warranted only when the breakdown in the appellate process consists of an error made by this court. *See Nooner*, 2014 Ark. 296, 438 S.W.3d 233. Allegations that postconviction counsel was ineffective are not errors by this court. We do not entertain a claim for recalling the mandate based solely on allegations of ineffective assistance of postconviction counsel. As we have held, recalling the mandate is an extremely narrow remedy reserved for unique situations; to enlarge it to allow typical claims of ineffective assistance of counsel would alter the nature of the relief entirely. *Ward*, 2015 Ark. 62, at 9–10.

## D. Failure to Amend the Rule 37 Petition

Isom's next contention is similar to his previous contention in that it focuses on the potential ineffective assistance of Rosenzweig rather than any error made by this court. Isom contends that Rosenzweig failed to amend his Rule 37 petition to reflect two meritorious claims for ineffective assistance that were proved during Isom's Rule 37 hearing. In short, these allegations do not relate to an error made by this court and, consequently, are not sufficient to warrant recalling the mandate in this case. *Nooner*, 2014 Ark. 296, 438 S.W.3d 233; *Ward*, 2015 Ark. 62.

11

1. *Critical Portions of the Trial were Conducted by Unprepared Counsel*

According to Isom, during his Rule 37.5 hearing. Rosezweig elicited testimony proving that critical portions of Isom's direct-appeal case were performed by unprepared counsel. Specifically, Isom contends that the testimony showed that, despite a "total lack of preparation," Bunch was asked to conduct the jury voir dire and was asked to cross-examine the rape victim. The State counters that Bunch had tried five to six capital cases where the death penalty was sought prior to performing the voir dire in Isom's case. The State points out that Bunch cross-examined the victim regarding her basis of knowledge for identifying Isom, her vison problems, and her use of pain medication. In addition, the State contends that there could be a strategic reason for allowing Bunch to bear the brunt of any potential animus the cross-examination might engender from the jury. Finally, the State maintains that Bunch admitted to visiting Isom in jail and reading portions of the trial to Isom and that those were not merely "social calls," implying that Bunch had substantial familiarity with and preparation for Isom's trial.

The record reveals that Bunch testified that he had previously represented Isom and would talk to Isom at the jail. While he denied ever going to visit Isom specifically, he testified that he would visit with him when visiting other clients and did read portions of the file to Isom. Bunch further testified that he was "completely caught off guard" by Colvin's request that he sit at the counsel table and perform trial duties. He stated that he was "absolutely unprepared" to do anything in Isom's trial, but that he did perform jury voir dire

after discussions with Colvin. Concerning his cross-examination of the victim, Bunch testified that after the direct examination was finished Colvin asked him to conduct cross-examination. He acknowledged that he may have read statements or documents involving the victim to Isom at the jail but that would have been the extent of his preparation and that he never had any discussions with Colvin regarding trial strategy.

Isom's claims simply do reveal any error made by this court and, therefore, are not a proper basis for recalling this court's mandate. This court is not required to develop arguments for a postconviction petitioner merely because some evidence was presented below. While Isom contends that Rosenzweig should have amended his Rule 37 petition to reflect the issues raised at trial, the trial court was not obligated to permit such an amendment. *See, e.g.*, *Weaver v. State*, 339 Ark. 97, 3 S.W.3d 323 (1999) (holding the trial court did not abuse its discretion in denying defendant a last-minute effort to insert a due-process claim into his postconviction petition during his Rule 37 hearing because the State was unprepared and unable to respond to the new theory without obtaining a continuance); *see also* Ark. R. Crim. P. 37.2(e) ("Before the court acts upon a petition filed under this rule, the petition may be amended with leave of the court."), and Ark. R. Crim. P. 37.5(a) ("Except as otherwise provided in this rule, the provisions of Rules 37.1, 37.2, 37.3 and 37.4 shall apply to a petition for post-conviction relief filed by a person under sentence of death.").

### 2. *Trial Counsel Had a Disqualifying Conflict of Interest*

Isom's next contention is that one member of his legal team, Gary Potts, had a disqualifying conflict of interest because he represented another inmate, Kevin Green, and that

Rosenzweig was ineffective for failing to amend his Rule 37 petition to include this claim. Isom contends that Potts "negotiated Mr. Green's pretrial release on his own recognizance on the basis that [Green] had information regarding the location of the scissors used to kill William Burton." Isom further contends that "[b]ecause Mr. Green had information regarding the Burton murder, he was a plausible alternative suspect for the crime."

Green testified during Isom's Rule 37 hearing and denied that he knew Potts or that anyone ever came to talk to him about Isom's case, although he eventually conceded that he was represented by the same public defender's office that represented Isom. He denied speaking with any other inmates about Isom's case. Although he admitted that he knew a man named Jerry Avery, he denied knowing a Jerry Don Avery and denied ever telling anyone that a man named Jerry Don Avery confessed to the crimes. Green denied providing any information regarding Burton's murder in order to be released.

After Green's testimony, Frank Spain, the prosecutor, alerted the court to what he believed to be false or inaccurate statements made by Green. Spain contended that Green was released on his own recognizance after providing information regarding the location of a pair of scissors that may have been used in the Burton murder. Spain stated that testing showed the scissors had no DNA on them and showed "no relationship" to the Burton murder.

Green was released on his own recognizance on April 30, 2001. The State contends that Spain was "mistaken" that Green provided information in exchange for being released because "scissors located at various locations (and found to have no evidentiary value) were all submitted to the crime lab on April 16, 2001, two weeks before Green appeared in court."

14

SLIP OPINION

Moreover, in this court's previous opinions we have stated that there has "been no showing of Green's involvement past pure conjecture." *Isom III*, 2010 Ark. 496, at 8, 372 S.W.3d at 814. Recalling the mandate is warranted only when the breakdown in the appellate process consists of an error made by this court. *See Nooner*, 2014 Ark. 296, 438 S.W.3d 233. Here, Isom has failed to show that there was anything in the record before this court that would warrant recalling the mandate in his postconviction proceedings because there was nothing in the record during Isom's postconviction proceedings to show that Green provided any information relevant to Isom's case. Allegations that postconviction counsel was ineffective are not sufficient for recalling the mandate. *Ward*, 2015 Ark. 62.

### E. Waiver of Exemption to the Death Penalty

Isom's next contention is that Rosenzweig was ineffective for waiving the claim that trial counsel was ineffective for failing to pursue a defense based on intellectual disability or mental retardation. Again, Isom fails to point to any error by this court that would support a recall of the mandate. *Id*.

The record reflects that a forensic psychologist interviewed Isom at Rosenzweig's request. Prior to trial, Isom underwent a mental evaluation at the state hospital and was interviewed by a forensic psychologist. That evaluation placed Isom's IQ at 77 and concluded that Isom was competent to stand trial. Moreover, Isom points to nothing in the record before this court to indicate that Isom was mentally retarded at the time of trial. In addition, there was nothing in the record that would have required the trial court, or this court, to sua sponte order additional investigation. *See, e.g.*, *Ward*, 2015 Ark. 62 (refusing to recall this

court's mandate when the defendant had received the constitutionally mandated evaluation at the state hospital and there was no evidence that the state-hospital evaluation was inadequate and no evidence presented that an independent evaluation would have rendered a different result).

## F. Photo Lineup

For his penultimate point, Isom maintains that Rosenzweig was "woefully deficient for failing to prove that the photo lineup used in the police investigation was unduly suggestive." The State points out that this court considered and rejected arguments regarding the photo lineup during Isom's postconviction appeal. Therefore, the State maintains that Isom has failed to show a defect or breakdown of the appellate process. We agree.

In *Isom I*, this court reviewed the circumstances surrounding the photo lineup:

> On April 5, 2001, Lieutenant Dement visited with Mrs. Lawson in the hospital to see if she could identify her assailant from a photographic lineup. In creating the photographic lineup, Lieutenant Dement testified that he considered race, dress, and facial hair of the participants. He testified that before the identification, Mrs. Lawson was "coherent." He stated that she was in her hospital bed, she wiped her eyes with a washcloth, and she wore her eyeglasses. She examined each picture, holding them closely to her face, without saying anything. After first focusing on photographs one and three, she selected photo three, which was Mr. Isom. Lieutenant Dement added that she expressed no uncertainty and was very adamant about her identification.

*Isom I*, 356 Ark. at 167, 148 S.W.3d at 264. We further recounted:

> Mr. Isom argues that the circuit judge erred in denying his motion to suppress the photographic lineup, because the other men in the photographs did not properly resemble him. Thus, the lineup was not reliable. According to Mr. Isom, the other men in the photographic display had facial hair and either had long hair or very short hair. Mr. Isom contends that he did not have facial hair and had medium-length hair. He also urges that the photographic lineup should have been suppressed, because Mrs. Lawson had just experienced a very traumatic act and had given a very general description of her assailant (black male, from five feet and seven inches tall to six feet

16

tall) and had failed to include Mr. Isom's gold teeth and facial scar. Plus, Mrs. Lawson did not recognize her eye doctor, whom she regularly visited, when she was in the hospital. He adds that Mrs. Lawson was initially uncertain of her choice, because she first focused on pictures one and three.

Although we question Mr. Isom's premise that the lineup was unduly suggestive, we decide this issue on a procedural point. As the State points out, Mr. Isom failed to object to Mrs. Lawson's in-court identification of Mr. Isom and, thus, failed to preserve this point for appeal. We said in Kimble that this failure to object to an in-court identification has the effect of waiving any issue relating to an allegedly defective photographic lineup. Mr. Isom's argument has no merit.

*Id.* at 180–81, 148 S.W.3d at 273–74.

In *Isom II*, we rejected Isom's contention that his trial counsel was ineffective for failing to object to the photo lineup or the rape victim's in-court identification:

Isom next argues that he was deprived of his right to counsel at the photo lineup and that the failure of trial counsel to object to the in-court identification by rape victim Dorothy Lawson deprived him of the opportunity to appeal the circuit court's finding that the earlier out-of-trial photo lineup was not unduly suggestive. On direct appeal, this court refused to consider the allegation of an unduly suggestive photo lineup because there was no objection to the in-court identification. Isom offers no proof of error in the circuit court's finding that the photo lineup was not unduly suggestive. Therefore, even if counsel erred in failing to object, Isom fails to bear his burden of showing that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different.

*Isom II*, 2010 Ark. 495, at 6, 370 S.W.3d at 495. Likewise, in rejecting Isom's petition for additional DNA testing of a hair recovered from the rape victim, this court recounted that the rape victim "told the police lieutenant who conducted the lineup that she was 'adamant' about the identification and made the identification 'with no uncertainty.'" *Isom III*, 2010 Ark. 496, at 2, 372 S.W.3d at 811.

This court has repeatedly addressed Isom's contentions that the photo lineup in this

case was unduly suggestive. We have recognized that two witnesses, the rape victim and the law enforcement officer who created the lineup, both testified concerning the identification. We have recognized that the rape victim's identification was "adamant" and was made "with no uncertainty." Finally, we have stated that Isom has failed to show that the circuit court erroneously concluded that the photo lineup was not unduly suggestive.

Isom now contends that his Rule 37 counsel could have presented evidence that "Isom appears to be the largest man in the lineup," and that "every foil in the lineup had prominent facial hair," whereas Isom did not, and that "[i]f the witnesses did not believe that the perpetrator had prominent facial hair . . . then only the suspect matched the descriptions in this regard." However, those are the types of arguments that this court rejected in *Isom II*, in which we acknowledged that Isom contended that the rape victim failed to mention his two gold teeth or his facial scar in her description. Rule 37 does not provide an opportunity to reargue points settled on appeal. *O'Rourke v. State*, 298 Ark. 144, 155, 765 S.W.2d 916, 923 (1989). To the extent that Isom is arguing prosecutorial misconduct in relation to the photo lineup, the issue of alleged prosecutorial misconduct is an issue that should have been raised on direct appeal and is not a claim that may be raised for the first time in a Rule 37 petition. *Howard v. State*, 367 Ark. 18, 27, 238 S.W.3d 24, 32 (2006).

Finally, Isom acknowledged that his argument on this point amounts to a contention that "[c]ounsel's failure was a breakdown in the process." Thus, he has not alleged an error on the part of this court in our review of his postconviction proceedings. *Ward*, 2015 Ark. 62.

18

### G. Allegation that Isom is Currently Not Eligible for the Death Penalty as a Result of Stroke

Isom's final contention is that he is not eligible for the death penalty because of a stroke he suffered while incarcerated. As his primary support, Isom cites to *Atkins v. Virginia*, 536 U.S. 304 (2002), which categorically banned execution of the mentally retarded, and *Ford v. Wainwright*, 477 U.S. 399 (1986), which prohibited execution of insane persons. As of the filing date of Isom's brief, no date has been set for his execution. Thus, his claim is not yet ripe for review. *See, e.g.*, *Nooner*, 2014 Ark. 296, at 27–28, 438 S.W.3d at 249 (refusing to address petitioner's claim of incompetency to be executed when no date had been set for his execution). Although we acknowledge Isom's contention that he has reached his maximum recovery and that he will not regain any additional functioning, we decline to evaluate his competency for execution in the absence of an execution date because Isom's condition could change, positively or negatively, before Isom's execution date is set.

In sum, recalling the mandate is an extremely narrow remedy reserved for unique situations. To enlarge it to allow typical claims of ineffective assistance of counsel, such as the claims presented by Isom in the present motion, would alter the nature of the relief entirely. *Ward*, 2015 Ark. 62, at 9–10. In addition, Isom's claims that he is incompetent to be executed are not yet ripe. Therefore, we deny his motion to recall the mandate from his postconviction proceedings.

Petition denied.

*Jenniffer Horan*, Public Defender, by: *Julie Vandiver* and *Scott W. Braden*, for appellant.
*Dustin McDaniel*, Att'y Gen., by: *Kent G. Holt* and *Brad Newman*, Ass't Att'ys Gen., for appellee.